UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. _______-Civ-________

IRA ROSNER, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

DELAWARE LIFE INSURANCE COMPANY; GROUP 1001 INSURANCE HOLDINGS, LLC; GROUP 1001, INC.; TWG GLOBAL HOLDINGS, LLC; GUGGENHEIM PARTNERS, LLC; and MARK WALTER,

Defendants.

_____________________________________/ DEMAND FOR JURY TRIAL

CLASS ACTION COMPLAINT

Plaintiff Ira Rosner ("Plaintiff' or "Rosner"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Delaware Life Insurance Company ("Delaware Life"); Group 1001 Insurance Holdings, LLC and Group 1001, Inc. (collectively, "Group 1001"); TWG Global Holdings, LLC ("TWG"); Guggenheim Partners, LLC ("Guggenheim"); and Mark Walter ("Walter") (collectively, "Defendants"), and alleges the following based upon personal knowledge as to Plaintiff's own acts and experiences, and upon information and belief as to all other matters, based upon the investigation of Plaintiff's undersigned counsel, which included, among other things, review of Delaware Life's statutory financial statements and other regulatory filings, Delaware Life's filings with the U.S. Securities and Exchange Commission ("SEC"), the complete transaction file for Plaintiff's annuity, rating-agency reports, and public reporting concerning Defendants:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiff and all similarly situated persons ("Class Members") who purchased or exchanged into annuities issued by Delaware Life, including fixed or fixed index annuities and associated income riders (collectively, the "Annuities"), during a period in which Defendants uniformly represented to purchasers, regulators, and the public—or aided and abetted and conspired with other Defendants in connection with their representations—that only approximately 3% of Delaware Life's invested assets were related-party investments, when in truth the figure was more than 1,000% greater.

2. Plaintiff brings claims under Indiana common law on behalf of a nationwide class for fraudulent concealment, fraud in the inducement, negligent misrepresentation, breach of contract and of the implied covenant of good faith and fair dealing, unjust enrichment, aiding and abetting fraud, civil conspiracy, and declaratory relief, together with a claim under Florida

Securities and Investor Protection Act on behalf of Florida purchasers only, and seeks rescission and restitution, compensatory and punitive damages, and injunctive relief. Plaintiff's claims all arise from Defendants' systematic scheme to conceal and misrepresent the allocation of insurer assets in entities affiliated with or controlled by Walter and the resulting risk to the guarantees Plaintiff and Class Members purchased and/or acquired from Defendants.

3. The duties Defendants breached, the standard of conduct against which their conduct is measured, and the materiality of what they concealed are all supplied by the insurance laws of Indiana and of every other state in which Defendants sold the Annuities. Those laws include: (a) the Indiana Insurance Code's prohibition of unfair and deceptive insurance practices, Ind. Code §27-4-1-4, which governs the conduct of the Zionsville, Indiana headquarters from which Delaware Life directs its business; (b) the Delaware Insurance Holding Company System Regulatory Act, 18 Del. C. §5001 *et seq.*, and the uniform statutory accounting principles promulgated by the National Association of Insurance Commissioners ("NAIC"), which required Delaware Life to identify and disclose its affiliated and related-party investments in the statutory financial statements it filed with the insurance regulators of Delaware, Florida, Indiana, and every other state in which it is licensed; (c) as to the Florida Subclass only, Florida's Insurance Code, including Part IX of Chapter 626 and/or Florida Statute Sections 626.99 and 627.4554; and (d) the materially identical unfair-insurance-trade-practices statutes and other insurance regulatory and disclosure statutes of the other states in which Class Members reside.

4. Defendants directly and/or in concert with each other, induced Plaintiff and Class Members to purchase or exchange into Delaware Life and related annuity products by emphasizing guaranteed lifetime income and other benefits backed by the issuing insurer's financial strength

and claims-paying ability, as well as the credit ratings of independent credit rating agencies that also relied upon Delaware Life's materially misleading statements and omissions.

5. Those guarantees were not backed by any segregated fund, collateral, or reserve dedicated to Plaintiff. They were, and are, an unsecured, long-dated promise payable out of Delaware Life's general account. Delaware Life's own illustration makes the point unmistakably: under the contract's minimum guaranteed values, Plaintiff's account value is projected to fall to zero in contract year 14, while the insurer remains obligated to pay $181,677 every year for the remainder of two lifetimes—against a total illustrated payout of $4,178,572. In other words, the overwhelming majority of the benefit Plaintiff purchased is payable only from the insurer's general assets, long after his own account is exhausted. The composition of those general assets was therefore not a detail. Whether they were genuinely diversified and independent, or were instead concentrated in loans to a single man's largely illiquid (and thus difficult to value) business empire, was the whole of the bargain.

6. Upon information and belief, Defendants made—or conspired with others to make—materially identical representations regarding guaranteed lifetime income and other benefits backed by the issuing insurer's financial strength and claims-paying ability to all Class Members who purchased one of Defendants' annuity products, including, but not limited to, Delaware Life's TruePath Income, TrackGuard+™, Growth Pathway®, and Momentum Growth,

and other fixed index annuities, multi-year guaranteed annuities, and variable annuities sold or offered by Defendants.[1,2]

7. Those representations were materially false and misleading because Defendants concealed the truth about Delaware Life's exposure to Walter-related parties. Delaware Life reported to regulators and represented to the public, including Plaintiff and Class Members, that related-party investments were approximately 3% of invested assets, or about $1.4 billion. After it received federal grand jury subpoenas in February 2026 and conducted an internal investigation, Delaware Life determined that its issued financial statements were materially misleading and required restatement.

8. The corrected figures are staggering: approximately $9.53 billion of private-credit investments were "predominantly contingent on the performance of affiliates" as of December 31, 2024; approximately $16.37 billion as of December 31, 2025; and approximately $16.82 billion as of June 30, 2026, plus roughly $821 million of additional funding-agreement and trust-note structures, the repayment of which likewise depends predominantly on affiliates. In its restatement of its audited 2025 financial statements, Delaware Life reported that affiliated investments stood at approximately 42% of invested assets, ***14 times*** the 3% originally warranted. The concealed concentration directly bore on the financial strength and claims-paying ability on which the Annuities' promised income depended.

---

[1] *See* Del. Life Ins. Co., *Delaware Life Annuities*, https://www.delawarelife.com/our-products/all-annuities-page (last visited Sep. 15, 2026); Clear Spring Life & Annuity Co., *Product Center*, https://clearspringlife.com/product-center (last visited Sep. 15, 2026).

[2] Delaware Life's variable annuities are registered with the SEC and are "securities" under the federal securities laws. *See SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65 (1959).

9. The magnitude is best understood against Delaware Life's own capital. Delaware Life reported capital and surplus of approximately $4.0 billion. The concealed related-party exposure is therefore roughly 300% greater than the entire equity cushion standing between policyholders and loss. And the concentration is not the ordinary kind an insurer discloses and a regulator polices. Only about $1 billion represented direct investments in affiliates. The remainder consisted of investments booked against nominal counterparties that appeared unaffiliated on their face, but whose repayment Delaware Life ultimately concluded depended predominantly on related parties—a structure that made a portfolio look diversified on paper while, in economic substance, but in reality, tied billions of dollars of policyholder-backing assets to the fortunes of one man's private business empire.

10. The Annuities further carried a ten-year declining withdrawal and surrender-charge schedule, beginning at 10% in the first contract year and declining by 1% per year to 1% in year ten, with a first-year free-withdrawal amount equal to the greater of 10% of premium or the applicable Required Minimum Distribution ("RMD"), and—separately and in addition—a Market Value Adjustment that may further reduce the amount an owner receives on any withdrawal in excess of the free-withdrawal amount or on surrender. Those charges exposed, and continue to expose, Plaintiff and Class Members to a substantial penalty for early withdrawal or surrender and impede rescission and return of premium when the product's guarantees were sold on the basis of undisclosed financial-strength risks.

11. Defendants' concealment also ran through, and outlasted, the only window in which Plaintiff could have walked away for free. Delaware Life's contract cover page, delivered to Plaintiff in Florida—and, in materially identical form, to every Class Member—states in capital letters that he could return the contract within 30 days after receiving it for a full return of

premium—a right the Florida Insurance Code, and the free-look statutes of every other state, independently guarantees. Plaintiff acknowledged delivery on April 23, 2026. That window closed in late May 2026. Delaware Life has since admitted the point in writing: in a letter dated August 26, 2026, it stated that it received Plaintiff's signed delivery receipt on April 24, 2026, and that "the period to cancel the contract under its 30-Day Right to Examine Contract provision would have ended no later than May 24, 2026"—over a month before Defendants disclosed the subpoenas which had been issued in February 2026.

12. Delaware Life neither disclosed its misstated financial statements nor the February 2026 grand jury subpoenas until regulatory filings dated June 26, 2026—weeks after Plaintiff's unconditional refund right, and the refund rights of every other purchaser whose unconditional refund rights lapsed following service of the subpoenas and prior to disclosure of the restated financial statements and the subpoenas' disclosure. Plaintiff brings this action on behalf of those purchasers as a subclass (the "Post-Subpoena Purchaser Subclass," defined below), because they share a distinct and readily identifiable injury: each of them was sold an Annuity by an insurer that already knew it was under federal criminal investigation for the very asset classification it was representing, and each of them lost a costless right of return while that fact was withheld. Had the truth been disclosed at any point before that date, Plaintiff and every member of the Post-Subpoena Purchaser Subclass would have exercised the right and recovered every dollar. Defendants' silence converted a costless exit into a 10% penalty, if they would have purchased the Annuity at all.

13. Plaintiff, on behalf of himself and all Class Members, brings this action to obtain rescission and return of the premium paid or applied, without deduction of surrender charges, Market Value Adjustment, or other penalties (or restitution of any such charges already paid), together with compensatory and punitive damages under Indiana common law for Defendants'

knowing and willful misconduct, statutory remedies, declaratory and injunctive relief, and all other available remedies.

**PARTIES**

14. Plaintiff Ira Rosner is a natural person who, at the time of the transaction, resided at 10101 SW 145 Street, Miami, Florida 33176, in Miami-Dade County, and was a citizen of the State of Florida. Rosner was born in January 1959 and was 67 years old at the time of the transaction; he is therefore a "senior consumer" within the meaning of Florida's annuity-suitability statute. At the time he applied for and received the TruePath Income Annuity, Rosner resided in the Southern District of Florida and was subject to Defendants' solicitation and sale there. Rosner purchased the TruePath Income Annuity, a fixed index annuity issued by Delaware Life, in April 2026. On or about August 20, 2026, once Defendants' fraud was discovered, Rosner surrendered the TruePath Income Annuity on or about August 27, 2026, and received the return of his premium minus a surrender charge and a Market Value Adjustment so imposed by Delaware Life in the aggregate amount of $116,575.53.

15. Defendant Delaware Life Insurance Company is a life insurer organized under the laws of the State of Delaware with its principal place of business at 10555 Group 1001 Way, Zionsville, Indiana 46077. Delaware Life is therefore a citizen of Delaware and Indiana. Delaware Life issues annuity contracts and insurance products, including the Annuities, and held approximately $69 billion in assets as of March 2026, and approximately $70.5 billion in assets under management as of June 30, 2026, supporting more than 380,000 active annuity and life policies. Against those liabilities, Delaware Life reported capital and surplus of approximately $4.0 billion. Delaware Life is controlled by Walter through TWG and Group 1001, and is the entity that made the related-party investment disclosures and subsequent restatements at issue in this

action. According to Delaware Life's own disclosures to Plaintiff, it "is a subsidiary of Group 1001 Insurance Holdings, LLC," and AM Best likewise describes Delaware Life as a "subsidiar[y] of Group 1001 Insurance Holdings, LLC." Delaware Life is authorized to transact insurance in Florida, Indiana, and every other state except New York.

16. Defendants Group 1001 Insurance Holdings, LLC and Group 1001, Inc. are, respectively, a Delaware limited liability company and a Delaware corporation, each with its principal place of business at 10555 Group 1001 Way, Zionsville, Indiana. Each is therefore a citizen of Delaware and Indiana. According to the organization chart Delaware Life filed with the SEC in April 2024 and to the Delaware Department of Insurance's published examination reports, Group 1001, Inc. and Group 1001 Insurance Holdings, LLC were formed in 2021 as part of a corporate reorganization, with Group 1001, Inc. established as the principal holding company of Walter's insurance enterprise and Group 1001 Insurance Holdings, LLC as the intermediate holding company that owns Delaware Life through intermediate subsidiaries. The enterprise traces to Delaware Life Holdings, founded in 2013 as an affiliate of Guggenheim, which rebranded as Group 1001 in 2017. "Group 1001" is the operating brand under which Delaware Life marketed the Annuities: Delaware Life's own disclosure and application materials delivered to Plaintiff identify it as "a member of Group 1001," its service address is 10555 Group 1001 Way, Zionsville, Indiana, and Group 1001 issues the public statements, press releases, and rating-agency communications on Delaware Life's behalf.

17. Defendant TWG Global Holdings, LLC is a Delaware limited liability company with its principal places of business in New York, New York and Chicago, Illinois. TWG is the holding company through which Walter controls Delaware Life, Clear Spring Life and Annuity Company ("Clear Spring"), and his stake in Guggenheim. According to the organization chart

Delaware Life filed with the SEC in April 2024, Walter owns TWG through two Delaware holding companies, DLICM, LLC (72.92%) and DLHPII Equity Participation Company, LLC (27.08%); TWG in turn owns TWG Financial Holdings, LLC (91.89%), which owns 100% of Group 1001, Inc., which owns 100% of Group 1001 Insurance Holdings, LLC, which owns Delaware Life. In August 2026, TWG agreed to swap up to $6.5 billion of Delaware Life's related-party investments for assets classified as independent, and TWG—not Delaware Life—has issued the public statements denying that any fraud occurred at Delaware Life.

18. Defendant Guggenheim Partners, LLC is an asset-management firm with approximately $362 billion in assets under management. Guggenheim served as the asset manager for the insurers' portfolios at issue, including portfolios supporting annuity guarantees issued by Delaware Life, and, upon information and belief, directed the allocation of insurer assets to Walter-related entities. Guggenheim is a Delaware limited liability company with its principal place of business in New York, New York, and a principal office in Chicago, Illinois.

19. Defendant Mark Walter is an individual and the Chief Executive Officer ("CEO") and co-founder of Guggenheim and the CEO and Co-Chairman of TWG. Walter controls Delaware Life and Clear Spring through TWG, which is the controlling equity holder of Group 1001. Walter is a citizen of the State of Illinois and owns property in Florida.

20. Defendants, other than Delaware Life, are referred to collectively herein as the "Non-Issuer Defendants." For purposes of the Class Action Fairness Act, an unincorporated association such as a limited liability company is deemed a citizen of the State where it has its principal place of business and the State under whose laws it is organized. 28 U.S.C. §1332(d)(10).

21. There are additional affiliated entities, presently unidentified, that acted as intermediaries for loans from Walter's insurers to other companies in his business empire

(collectively, the "Unnamed Co-Conspirators"). Plaintiff reserves the right to amend this Complaint to add such entities, and any other person or entity whose participation in the conduct alleged herein is revealed through discovery, including the intermediate holding companies in Walter's ownership chain, the insurers' independent auditor, and the credit-rating provider identified below, as Defendants once their identities and roles are ascertained through discovery.

**JURISDICTION AND VENUE**

22. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because this is a class action involving more than 100 putative Class Members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Minimal diversity is established because Plaintiff and/or at least one Class Member is a citizen of a state different from at least one Defendant. Plaintiff is a citizen of Florida.

23. This Court has personal jurisdiction over each Defendant because, upon information and belief, each Defendant transacted business in, and directed annuity solicitations and insurance-product materials to, this District; contracted to insure persons and risks located in Florida; and committed tortious acts within Florida. Defendants' conduct included the solicitation, processing, issuance, and delivery of the TruePath Income Annuity to Plaintiff while he resided in Miami-Dade County, and their tortious conduct was directed at and caused injury to Plaintiff and Class Members in this District.

24. Venue is proper in this District under 28 U.S.C. §1391(b)(2) and (c)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including the solicitation, application, funding, and delivery of Plaintiff's Annuity in Miami-Dade County, Plaintiff resided in this District at the time of the transaction, and Defendants conduct, and continue to conduct, substantial business in this District.

## FACTUAL ALLEGATIONS

**Delaware Life's Status as an Authorized Insurer and the Duties the Law Imposes on Defendants**

25. Delaware Life is a life insurer authorized to transact insurance business in Florida. Delaware Life's own public materials state that it "is authorized to transact business in all states (except New York), the District of Columbia, Puerto Rico, and the U.S. Virgin Islands," which includes Florida—a representation printed on the face of the very Consumer Profile and disclosure forms delivered to purchasers. A 2023 filing with the SEC likewise states that Delaware Life is authorized to transact business in 49 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

26. Group 1001 is, upon information and belief, the parent of Delaware Life, and Walter controls or directs the enterprise through Group 1001 and TWG.

27. As an insurer authorized to transact business in Florida, Delaware Life is subject to the Florida Insurance Code, including Part IX of Chapter 626, and to oversight by the Florida Office of Insurance Regulation ("FLOIR") and the Florida Department of Financial Services ("DFS"). Insurers and persons acting on their behalf are prohibited from making or causing to be made false or misleading representations of material fact in connection with the sale of insurance products, including misrepresentations as to a life insurer's financial condition, and are prohibited from knowingly filing false material statements with any supervisory or other public official.

28. Florida law does not leave the content of an annuity sale to the parties' discretion. Florida Statutes Section 627.4554 requires an insurer to have a reasonable basis to believe an annuity is suitable before issuing it, requires that the consumer be reasonably "informed of various features of the annuity," and, in the case of an exchange or replacement, requires the insurer and producer to evaluate whether the consumer will incur a new surrender period or lose existing

contractual benefits. Section 626.99 requires that annuity contracts provide an unconditional refund period of at least 21 days. Florida rules required Defendants to deliver to Plaintiff, and Defendants did deliver, a Notice to Applicant Regarding Replacement (form IND-SR0003FLE) and a Disclosure and Comparison of Annuity Contracts (form DFS-H1-1081). Each of these requirements exists for a single reason: because the Florida Legislature determined that an annuity purchaser cannot independently verify what stands behind the promise he is buying, and must therefore be so informed.

29. The same duties exist, in materially identical form, in every other state in which Defendants sold the Annuities. The unfair-insurance-trade-practices statutes of the states are modeled on the NAIC Unfair Trade Practices Act and uniformly prohibit misrepresenting the benefits or terms of a policy, misrepresenting an insurer's financial condition, making false statements to regulators, and "twisting." Indiana, from which Delaware Life directs its business and whose common law governs the claims of the Nationwide Class, prohibits the same conduct at Indiana Code Section 27-4-1-4, and the annuity-suitability and free-look requirements that Florida imposes are likewise the product of NAIC model regulations adopted throughout the country. Whatever state's law is applied, the standard of conduct Defendants violated is the same.

30. The specific representation at issue—Delaware Life's reported related-party concentration—was itself the product of a mandatory disclosure regime. Delaware Life is a member of an insurance holding company system within the meaning of the Delaware Insurance Holding Company System Regulatory Act, 18 Del. C. §5001 *et seq.*, which requires it to register with the Delaware Department of Insurance and to disclose its transactions and investments with affiliates. Every quarter and every year, Delaware Life files statutory financial statements, prepared in accordance with the NAIC's Statements of Statutory Accounting Principles, with its

domiciliary regulator in Delaware and with the insurance regulators of every state in which it is licensed, including Florida and Indiana. Those statements require an insurer to identify its affiliated and related-party investments, including in the investment schedules and in the holding-company schedule that maps the insurer's relationships to its affiliates. The rating agencies whose financial-strength ratings appear on Delaware Life's sales materials derive those ratings from the same statutory statements. The reported 3% figure was thus not a stray remark. It was a sworn, regulator-facing representation that flowed directly into the ratings and financial-strength representations Defendants placed in front of every purchaser.

31. Defendants repeatedly represented, or conspired with other Defendants to represent, that the Annuities' guarantees were backed by the financial strength and claims-paying ability of Delaware Life. Accordingly, Delaware Life's true financial condition and related-party asset concentration were material facts to Plaintiff and Class Members. Defendants' knowing concealment of the approximately 39% to 42% concentration, at least approximately $16.37 billion at year-end 2025 and $16.82 billion at June 30, 2026, versus the approximately 3% previously disclosed, constituted a false or misleading representation or omission bearing directly on those financial-strength and claims-paying-ability representations.

**Background on Defendants' Annuities and Portfolio Scheme**

32. Based on public reports and regulatory filings, two life insurers controlled by Walter—Delaware Life and Clear Spring—steered large amounts of policyholder premiums and other insurer assets into private-credit deals, including loans tied to Walter's own broader business empire.

33. Guggenheim, where Walter serves as CEO, is, upon information and belief, the "affiliate" that Delaware Life has said "introduced" to it and to Clear Spring the private-credit

investments now under federal investigation. Guggenheim built Clear Spring's predecessor and helped Walter acquire or recapitalize the insurers now within Group 1001.

34. Delaware Life uniformly represented to potential Annuity purchasers, regulators, and the public, including Plaintiff and Class Members, in statutory filings made in and after June 2025 and in the financial-strength representations derived from them, that approximately 3% of its investments—approximately $1.4 billion of total invested assets—constituted related-party investments tied to Walter-linked companies. Those public and regulatory representations were material to purchasers of annuities, including Plaintiff and Class Members, whose guarantees depended on Delaware Life's financial strength and claims-paying ability.[3]

35. The approximately 3% figure was materially false when made. After federal grand jury subpoenas were served in or about February 2026, prompting an internal review, Delaware Life restated the figure to approximately $16.37 billion as of December 31, 2025—representing at least 39% of total invested assets—and, in its reclassification of its audited 2025 financial statements, to approximately 42% of invested assets. That restatement bears directly on the ability of Delaware Life to perform the financial-strength-backed guarantees sold to Plaintiff and Class Members.

36. Based on *Bloomberg News* reporting and regulatory filings, Delaware Life disclosed approximately $16 billion more in private-credit assets linked to affiliates than it had previously reported. As of December 31, 2025, its total related-party investments rose to at least $16.37 billion, or at least 39% of total invested assets, from approximately $1.4 billion, or about

---

3 *See, e.g.*, Matthew Sellers, *Mark Walter's insurers face federal probe over undisclosed related-party investments*, Ins. Bus. (July 21, 2026), https://www.insurancebusinessmag.com/us/news/life-insurance/mark-walters-insurers-face-federal-probe-over-undisclosed-relatedparty-investments-583106.aspx.

3%, reported earlier in the year; an earlier related-party total as of December 2024 was approximately $9.53 billion of private-credit investments later judged to be "predominantly contingent on the performance of affiliates," with public reporting describing an earlier related-party total exceeding $11 billion. As of June 30, 2026, the figure was approximately $16.82 billion, together with roughly $821 million of funding-agreement and trust-note structures whose repayment likewise depends predominantly on affiliates. Public reporting has described the aggregate loans at issue as approximately $20 billion.

37. The character of the concealment matters as much as its size. Of the restated exposure, only approximately $1 billion consisted of direct investments in affiliates. The balance consisted of investments held against nominal counterparties that were not themselves affiliates on paper, but whose ability to repay Delaware Life depended predominantly on Walter-related parties. Delaware Life lent to Company A; Company A's ability to repay depended on Company B; and Company B was economically connected to Walter. The result was a portfolio that appeared diversified across many borrowers while, in economic substance, concentrating billions of dollars of policyholder-backing assets on a single credit. That is precisely the risk that related-party disclosure rules exist to reveal, and precisely the risk that Defendants' reported 3% figure concealed.

38. Public reporting confirmed, in or about August 2026, that Walter offered to pledge his equity stake in Guggenheim as collateral to secure billions of dollars in short-term loans to his holding company, TWG, reportedly promising lenders double-digit yields. The reported financing was part of an effort to raise cash to reduce affiliated or related-party assets on the insurers' balance sheets, pursuant to a remediation plan reportedly developed with insurance regulators; if TWG failed to repay within a year, creditors could seize and sell the pledged Guggenheim interest.

39. Around the same time, Walter agreed to sell the Los Angeles Lakers at a reported $12.5 billion valuation—roughly $2.5 billion more than the reported valuation at which he had acquired a controlling interest in the team only about 14 months earlier, and less than a month after *Bloomberg* first reported the federal investigation. Public reporting connected the proceeds and timing of the sale to Walter's effort to raise cash to address insurer loans under federal scrutiny, although the precise disposition of the proceeds has not been publicly established.

40. The massive undisclosed concentration of related-party assets supporting policyholder obligations and Annuity guarantees was facilitated by at least four presently unidentified intermediary entities—the full extent and structure of which Defendants continue to conceal, but which Walter caused to be deployed as the assets backing Class Members' guarantees—that act as conduits for loans from Walter's insurers to other companies in his business empire. Federal authorities are reportedly focused on these entities and examining whether Walter or entities he controls committed fraud.

41. According to *The Wall Street Journal*, federal investigators are focused on four intermediary entities reported as ABS Capital, Amistad Financial, Bradford Allen, and Hudson Trading Inc. The proceeds of loans made by Walter's insurers reportedly passed through firms purportedly controlled by each of those intermediary entities before being used to fund other Walter-linked businesses, a structure that allegedly made the transactions appear arm's-length even though they were, in substance, related-party transactions.

42. Those four intermediary entities are among the previously unidentified intermediaries referenced in the Unnamed Co-Conspirators allegation above. Plaintiff presently identifies them in the factual allegations only, does not add them to the caption or named-defendant

list, and expressly reserves the right to name those four intermediary entities, including Hudson Trading Inc., as defendants once discovery confirms their roles.

**Defendants Were on Notice: The Same Conduct Was Alleged Against Walter's Insurers in 2014**

43. The concealment alleged here was not a first offense. In February 2014, two policyholders of insurers then controlled by Walter and Guggenheim filed a proposed class action alleging that policyholder funds had been used to finance Walter's and Guggenheim's 2012 acquisition of the Los Angeles Dodgers, that the use of those funds had not been disclosed in regulatory filings, and that the insurers had obscured their "affiliated investments." One plaintiff alleged that money she paid into her policy funded a $35 million loan connected to the Dodgers purchase and that her request for a refund was refused. The complaint was voluntarily dismissed without prejudice the day after it was filed. According to public reporting, the forensic accountant whose work underpinned that complaint has since provided it to the federal prosecutors now investigating Delaware Life, and has stated that it put Walter and his companies on notice, more than a decade ago, that they "knew they shouldn't be doing this." Defendants thus knew, long before the Class Period, that concealing the affiliated character of insurer investments from regulators and policyholders was unlawful, and that policyholders had objected to it.

**Federal Investigations**

44. Federal prosecutors in the Southern District of New York and the SEC are investigating whether Delaware Life, Clear Spring, and Guggenheim concealed that private-credit investments backed other parts of Walter's business empire.

45. According to *Bloomberg News* and an exclusive report by *The Wall Street Journal*, federal prosecutors and the SEC are also investigating whether Walter or businesses he controls committed fraud by concealing the true extent to which the insurers' private-credit investments

were loans backing other parts of his business empire, and whether Guggenheim accurately represented its revenue and investment practices in its role as asset manager.

46. *The Wall Street Journal* reported that federal prosecutors were examining roughly $16 billion in transactions linked to the Walter-controlled insurers.

47. The grand jury subpoenas described above were issued by or through the U.S. Attorney's Office for the Southern District of New York, and Delaware Life and Clear Spring disclosed the subpoenas in regulatory filings dated June 26, 2026. Delaware Life has stated that it understands the investigation to concern whether certain private-credit investments introduced to Delaware Life and Clear Spring by an affiliate should have been treated as affiliated or related-party transactions. Critically, the subpoenas were served in February 2026, and Defendants nonetheless continued to solicit, issue, and deliver Annuities to Plaintiff and Class Members for more than four months thereafter—through and beyond the expiration of those purchasers' unconditional refund rights—without disclosing either the subpoenas or the misclassification they concerned. Defendants therefore knew, at every step of every Annuity sale made during that period, that federal prosecutors had subpoenaed them over the very asset classification they were simultaneously representing to be approximately 3%. They kept selling and said nothing. Plaintiff's own transaction fell squarely within that window: he applied on April 1, 2026, the contract was issued on April 8, 2026, it was delivered on April 23, 2026, and his 30-day unconditional refund right expired in late May 2026.

48. Federal prosecutors have also inquired about loans made by Walter's insurance operation to a string of companies affiliated with Chicago-based Hudson Trading Inc. The probe has extended to Chicago. Hudson Trading Inc. is a newly identified Walter-affiliated or related

entity connected to the related-party loan structure and, upon information and belief, is among the affiliated entities and/or intermediaries referenced in the Unnamed Co-Conspirators allegation.

49. In addition, the Federal Bureau of Investigation executed at least one search warrant in or about September 2025, and seized a mobile phone and computer—reportedly Walter's own, seized aboard a private plane in Chicago—in connection with the investigation, all traced to a whistleblower complaint from within Guggenheim.

50. Upon information and belief, TWG has since retained a former senior Goldman Sachs lawyer as its top legal officer in response to the investigations, and a $1.2 billion loan to a vehicle affiliated with Guggenheim Investments fell from approximately $.96 to approximately $.78 on the dollar in August 2026 after a lender call failed to reassure creditors—a market repricing of Walter-linked credit that occurred while Plaintiff's and Class Members' premiums sat inside Delaware Life's general account.

51. In the meantime, S&P Global ("S&P") has revised Delaware Life's outlook from stable to negative, reflecting the market's concern about the concentration of related-party investments and the ongoing federal investigations.

52. In or about August 2026, TWG agreed to swap up to $6.5 billion of Delaware Life's related-party investments for assets classified as independent—an implicit acknowledgment of the excessive related-party concentration and a development bearing directly on the reliability of the financial-strength and claims-paying-ability guarantees sold to Plaintiff and the Class.

53. Based on public reporting regarding the insurers' remediation plan, Delaware Life and Clear Spring planned to report a reduction of up to $8 billion in affiliated assets in an upcoming quarterly update as part of that plan. The reported effort to reduce affiliated assets further

underscores the materiality of the concealed concentration to Delaware Life's financial strength and claims-paying ability, on which Rosner's and the Class' Annuity income depended.

54. The market for the Annuities themselves has reacted the same way. In late August 2026, public reporting confirmed that at least two national bank distributors, Truist Financial Corporation and Fifth Third Bancorp, had paused sales of Delaware Life's annuity products in light of the federal investigations into how approximately $20 billion of the insurer's assets affiliated with Walter-controlled entities had been reported. Two days earlier, TWG—not Delaware Life—had issued a public statement asserting that "there has been no fraud" at Delaware Life and Clear Spring. Sophisticated distributors with their own suitability obligations thus concluded that the concealed concentration was material enough to stop selling the products to their customers; Plaintiff and Class Members were never given the chance to make the same judgment.

55. As of late August 2026, public reporting, including reporting by *The Athletic* and *The New York Times* on August 24, 2026, confirmed that the federal investigation into Walter's two insurers, Delaware Life and Clear Spring, and Guggenheim remained ongoing. The reporting described prosecutors' continuing examination of the insurers' allegedly false reporting of affiliated investments and related-party transactions.

56. Public company disclosures further reported that, as of June 30, 2026, Delaware Life had approximately $70.5 billion in assets under management and more than 380,000 active annuity and life policies. As of the relevant dates, Delaware Life's financial-strength ratings were AM Best A- with a negative outlook (as of July 31, 2026), S&P A- with a negative outlook (as of July 14, 2026), and Fitch A- on negative watch (as of July 22, 2026). These three rating actions—each taken by an independent professional evaluator of same financial information Defendants

represented to Plaintiff—confirm the materiality of Delaware Life's financial condition and claims-paying ability to the Annuity guarantees, and confirm that the concealed information, once revealed, measurably impaired the value of the promise Plaintiff and Class Members bought.

**Plaintiff's Annuity Transaction and Defendants' Misconduct**

57. On or about April 1, 2026, Rosner, while residing in Miami-Dade County, Florida, applied through his financial professional for a Delaware Life TruePath Income Annuity, a modified single premium deferred fixed index annuity with index-linked options issued by Delaware Life, a member of Group 1001. The application and accompanying replacement materials documented that the transaction would be funded through a 1035 exchange or replacement of Rosner's existing Jackson National Life "Perspective II" variable annuity, which carried a Lifeguard Freedom Flex 7% Guaranteed Minimum Withdrawal Benefit ("GMWB") rider. The application identified one expected payment and a total premium in excess of $1 million to Delaware Life. Delaware Life's own Disclosure and Comparison of Annuity Contracts recorded that the surrender charge applicable to the Jackson contract at exchange was $0.00—the Jackson policy was out of its surrender period—and that the exchange would cause Rosner to lose the Jackson death benefit and "Established Income Base" of $995,594.22, and to begin a new ten-year surrender period at 10%.

58. The April 1, 2026 client acknowledgment and recommendation materials stated that Rosner sought to replace the Jackson annuity with Delaware Life because of the income rider, planned to activate the income rider at approximately age 77, and would receive joint income for himself and his wife, Elaine Rosner, then age 65.

59. Specifically, the materials represented that the Annuity would provide after a ten-year holding period guaranteed joint lifetime income of $181,677 per year for Rosner and his wife,

a substantial increase over the $97,253 per year single-life guarantee under the Jackson policy. Those materials were used in the solicitation and sale of the Annuity on or about April 1, 2026. The representation was unqualified. In the producer's written basis for the recommendation, recorded on Delaware Life's own Consumer Profile form and submitted to and accepted by Delaware Life, the statement is flat: "the proposed Delaware Life policy provides a significantly higher guaranteed income of $181,677 annually on a joint-life basis." Delaware Life's Guaranteed Lifetime Withdrawal Benefit Summary, generated by Delaware Life on its own form, carries the same $181,677 figure across every year from contract year ten through age 98, and totals the promised withdrawals at $4,178,572.

60. The same materials represented that Rosner could activate the income rider at approximately age 77 and that the Annuity included a chronic illness multiplier, also described as an Additional Withdrawal Amount or "AWA" Multiplier, that was not available under the Jackson policy.

61. The disclosure and product-summary materials also stated that the GLWB rider carried a 1.20% annual rider fee, that the Annuity had a ten-year declining surrender-charge schedule with charges of 10% in year one, declining by 1% per year to 1% in year ten, and that in the first contract year the free-withdrawal amount was the greater of 10% of premium or the applicable RMD. Separately, and in addition to those charges, the contract imposes a Market Value Adjustment on withdrawals in excess of the free-withdrawal amount and on surrender, calculated by reference to Moody's Bond Indices—Corporate Average, which may further reduce the amount an owner receives.

62. Delaware Life issued to Plaintiff a fixed annuity on or about April 8, 2026. The issued contract reflected an Initial Premium of $1,013,590.14. Plaintiff acknowledged receipt and

delivery of the contract on April 23, 2026. The specifications pages identify the withdrawal and surrender charge schedule as 10.00%, 9.00%, 8.00%, 7.00%, 6.00%, 5.00%, 4.00%, 3.00%, 2.00%, 1.00%, and 0.00% for contract years one through eleven and beyond.

63. The first page of the contract Delaware Life delivered to Plaintiff bears the caption "Important Time Sensitive Information – Read Immediately / Deadline: Right to Cancel and Receive Unconditional Refund," and states, in capital letters: "YOU MAY RETURN YOUR CONTRACT UP TO 30 DAYS AFTER YOU RECEIVE IT FOR A FULL RETURN OF THE PREMIUM PAID." Because Plaintiff acknowledged delivery on April 23, 2026, that unconditional refund right expired on or about May 23, 2026. Delaware Life has admitted as much in writing. In a letter dated August 26, 2026, signed by its Customer Relations department, Delaware Life stated that it received Plaintiff's signed delivery receipt on April 24, 2026, and that "therefore, the period to cancel the contract under its 30-Day Right to Examine Contract provision would have ended no later than May 24, 2026." Defendants disclosed the February 2026 grand jury subpoenas in regulatory filings dated June 26, 2026—more than a month after the window closed. Defendants thereby ran their concealment through the period during which Florida law and their own contract gave Plaintiff a costless exit, and extinguished that right without his knowledge of their material misstatements and omissions.

64. Critically, the disclosure, illustration, and related materials repeatedly stated that, "[g]uarantees are backed by the financial strength and claims-paying ability of Delaware Life Insurance Company (Zionsville, IN)" and explained that any guarantee was only as strong as the insurer's financial ability to pay claims. These statements made Delaware Life's financial condition and asset allocation material to Rosner's decision. The same representation appears, in substance, throughout the Delaware Life-approved sales package: the Product Disclosure

Statement states that guarantees "are backed by the financial strength and claims-paying ability of Delaware Life Insurance Company"; the illustration states that "[a]ll guarantees . . . are based on the claims-paying ability and financial strength of Delaware Life Insurance Company"; and the Buyer's Guide delivered with the package emphasizes that "[a]ll product guarantees depend on the insurance company's financial strength and claims-paying ability." Defendants thus did not merely omit the truth about Delaware Life's financial condition. They affirmatively directed Plaintiff's attention to that condition as the thing on which his retirement income depended, and confirmed it was sound.

65. From their headquarters in Indiana, Defendants made materially identical disclosures, illustrations, and representations to Class Members for all of their Annuities, using standardized, company-approved forms that Delaware Life drafted, generated, and required their appointed producers to deliver. Delaware Life's producer certification form required each producer to certify that he "used only Company-approved sales material" and "made no representation that differs from Company-approved sales materials." The financial-strength representation was therefore not the improvisation of an individual agent. It was a term of Defendants' own printed forms, delivered to every purchaser.

66. At the time Defendants induced Rosner and Class Members to purchase or exchange into Delaware Life Annuities in reliance on those guarantees, Defendants concealed that Delaware Life had allocated more than $14 billion of invested assets, beyond the approximately $1.4 billion it had disclosed, to entities affiliated with or related to Walter, and had received federal grand jury subpoenas concerning precisely that classification. Defendants and Delaware Life had instead reported or represented to regulators and the public that related-party investments were approximately 3%, or approximately $1.4 billion.

67. The omitted concentration was material because it directly bore on the financial strength and claims-paying ability of the insurer that stood behind the $181,677 joint-lifetime income representation and the GLWB rider. A reasonable purchaser would consider a roughly 39% to 42% concentration in Walter-related entities, rather than the approximately 3% public and regulatory figure, which is important in evaluating conflicts, the insurer's ability to pay claims, and whether to replace an existing annuity. A reasonable purchaser would also have considered the pending grand jury subpoenas and federal investigation in evaluating the trustworthiness of an insurer obligated to pay him and his wife a lifetime income.

68. Materiality here is not a subjective matter. It follows from the structure of the Annuities Defendants sold. Under the minimum guaranteed values in Delaware Life's own illustration—the only values in that illustration that are guaranteed rather than hypothetical—Plaintiff's account value declines every year, falls to $205,040 in contract year 13, and reaches zero in contract year 14, when Plaintiff would be 79. The Surrender Value and Death Benefit likewise fall to zero. Yet the illustration shows Delaware Life continuing to pay $181,677 every year thereafter, for as long as either covered person lives, out of a total illustrated payout of $4,178,572. On those guaranteed assumptions, well over $3 million of the benefit Plaintiff purchased—roughly three-quarters of it—is payable not from anything in his account, but from Delaware Life's general assets, decades into the future. A purchaser buying that promise is, in substance, an unsecured long-term creditor of the insurer. For such a purchaser, the composition and independence of the insurer's general account is not one consideration among many. It is the only thing standing between him and nothing.

69. The rating agencies confirmed the point within weeks after the restatement. S&P revised Delaware Life's outlook to negative on or about July 14, 2026; Fitch placed its ratings on

negative watch on or about July 22, 2026; and AM Best assigned a negative outlook on or about July 31, 2026. Each agency exists to assess precisely the attribute Defendants represented to Plaintiff—claims-paying ability—and each downgraded its assessment upon learning what Plaintiff was never told. Defendants themselves treated the concentration as material: within weeks they announced a remediation plan, agreed to swap up to $6.5 billion of related-party assets for independent assets, and planned to report a reduction of up to $8 billion in affiliated assets. An insurer and its affiliates do not spend billions of dollars to attempt to remedy an immaterial condition.

70. Neither Plaintiff nor any Class Member could have discovered the truth. Delaware Life is not a public reporting company; its financial condition is knowable to consumers only through the statutory filings it makes with insurance regulators and the ratings derived from them. Yet, those filings reported affiliated assets of only approximately 3% and failed to disclose the federal investigation long after the information would have been useful to the Class members. The concealment was not accomplished by a single false line item but by a structure—nominally unaffiliated counterparties standing between the insurer and the ultimate economic exposure—that was designed to give the appearance of an unaffiliated transection in order to avoid the kind of scrutiny a diligent reader could apply. It took federal grand jury subpoenas and an internal investigation to force this concealment's disclosure. The law of every state recognizes this asymmetry: it requires insurers to disclose because it presumes purchasers cannot verify. Defendants alone possessed the information, and Defendants alone controlled whether and what its policy holders, rating agencies, and other financial professionals were told.

**Plaintiff's Reliance and the Injury He and the Class Sustained**

71. Rosner relied on the documented representations and omissions: he applied for the Annuity and directed the transfer of his existing annuity's value, $1,013,590.14, as credited by Delaware Life as Initial Premium on the date of issue—to Delaware Life, and placed his existing policy and its associated benefits at risk of replacement. Had he known the true related-party concentration, the pendency of the federal grand jury subpoenas, and their bearing on Delaware Life's guarantees, he would not have proceeded, and if he had learned any of it before May 23, 2026, he would have exercised his unconditional right to return the contract for a full refund of premium. The ten-year surrender-charge schedule trapped his principal in the Annuity, and when Plaintiff sought to extricate himself, Delaware Life required him to pay a surrender charge and a Market Value Adjustment to do so, despite a request made on his behalf for a waiver of such charges. The guarantees for which he had exchanged his Jackson National contract were sold to him without disclosure of the concentration risk, and he has now forfeited them entirely in order to avoid even greater loss if Delaware Life's financial condition were further to deteriorate in the wake of its belatedly disclosed malfeasance.

72. Once the truth emerged, Plaintiff asked Delaware Life to undo the transaction. In August 2026—after Delaware Life's June 26, 2026 disclosure of the federal grand jury subpoenas, after its restatement of related-party investments to approximately 42% of invested assets, and after S&P, Fitch, and AM Best had each downgraded their assessments of its claims-paying ability—a request was submitted on Plaintiff's behalf asking Delaware Life to surrender the contract without assessing surrender charges or other penalties.

73. Delaware Life refused, and confirmed its refusal in a letter dated August 26, 2026, which stated that it had "reviewed" the request and "identified no contractual basis to terminate

the contract without surrender charges and penalties," that it was "obligated to administer our annuity contracts consistent with their terms and conditions," and that it "must decline to cancel the contract without penalty." Delaware Life thus took the position that the terms of an annuity it sold to Plaintiff by concealing these adverse facts entitled it to charge Plaintiff and Class Members for leaving.

74. Plaintiff was left in a Catch-22: remain in a contract whose central promise required him to trust the Defendants, who had belatedly revealed that they were under federal criminal investigation for misreporting the very assets backing that promise and who were continuing to conceal the full extent of it, or pay to get out. Plaintiff surrendered the contract on or about August 25, 2026, and Delaware Life deducted a surrender charge and a Market Value Adjustment from his account value before releasing the balance. The surrender was not a voluntary change of investment strategy. It was the only exit Defendants left open, and Defendants extracted an ill-gotten gain for doing so.

75. Plaintiff and the Class have suffered present, concrete, and quantifiable economic loss and injury. Plaintiff does not allege merely that Delaware Life may someday fail to pay. He alleges the following distinct injuries, each of which was complete at or shortly after the point of sale:

(a) **Overpayment / benefit of the bargain**. Plaintiff and the Class paid a price set for a long-term unsecured promise backed by an asset portfolio represented to be approximately 97% independent and arms' length. They instead received a promise backed by a portfolio of which approximately 39% to 42% was largely illiquid and dependent on the success of a single related party, against capital and surplus of approximately $4.0 billion. A promise carrying materially greater credit risk is worth materially less. The difference between what Plaintiff and the Class

paid and what they received was a loss at the moment of purchase, and it is measurable by ordinary credit-valuation methods.

(b) **Loss of the unconditional refund right**. Defendants' concealment ran through and beyond the 30-day window in which Plaintiff and every other member of the Post-Subpoena Purchaser Subclass could have returned the contract for a full refund. That right had independent economic value and is now gone.

(c) **Surrender charges and Market Value Adjustments**. Class Members who remain in their Annuities cannot exit without paying surrender charges and a Market Value Adjustment, and Delaware Life has stated in writing that it will not waive them. Class Members who have already surrendered, including Plaintiff, have paid those charges and, in doing so, forfeited the guaranteed lifetime income for which they paid. That cost exists only because Defendants induced the purchase by concealment.

(d) **Surrender of the Jackson benefits**. Plaintiff gave up a fully vested Lifeguard Freedom Flex 7% GMWB rider with a Guaranteed Withdrawal Balance of $995,594.22, a death benefit, and a contract that had exited its surrender period entirely—a costless, liquid position—and received in exchange a new ten-year surrender period. Delaware Life's own comparison form identifies these as benefits lost. Many Class Members likewise moved existing annuities into a Delaware Life Annuity.

(e) **Diminution in the value of the contract**. Following the restatement, three separate rating agencies downgraded their assessments of Delaware Life's claims-paying ability, and national bank distributors stopped selling the product. Plaintiff's and Class Members' contracts are worth less on any market than identical contracts issued by an insurer whose reported financials were true.

**Tolling, Fraudulent Concealment, and the Discovery Rule**

76. Any applicable limitations period is tolled by the discovery rule and by Defendants' fraudulent concealment. The true related-party concentration was self-concealing: it was reported to regulators as approximately 3%, and the structures that produced it were designed to present nominally unaffiliated counterparties. Neither Plaintiff nor any Class Member knew, or in the exercise of reasonable diligence could have known, of the concealment before Delaware Life's restatement and the June 26, 2026 regulatory filings disclosing the grand jury subpoenas. Defendants remained silent through the entire period during which Plaintiff could have unwound the transaction without cost. Defendants are further estopped from asserting any limitations defense by reason of that concealment.

## CHOICE OF LAW

77. Indiana common law governs the claims of the Nationwide Class. Delaware Life, Group 1001 Insurance Holdings, LLC, and Group 1001, Inc. each maintain a principal place of business at 10555 Group 1001 Way, Zionsville, Indiana, and the conduct giving rise to the claims of Plaintiff and every Class Member emanated from there. Upon information and belief, it was in and from Zionsville that Delaware Life prepared the statutory financial statements that carried the false 3% related-party figure; drafted, approved, and generated the standardized contracts, illustrations, disclosure statements, and sales materials that carried the financial-strength representation to every purchaser; required its appointed producers to certify that they would use only those Company-approved materials; accepted applications and issued and administered the Annuities; and decided to keep selling the Annuities after the federal grand jury subpoenas were served in February 2026.

78. Indiana, therefore, has the most significant relationship to the claims of the Nationwide Class. Defendants' misrepresentations and omissions were uniform. They were conceived, prepared, and disseminated from Indiana, and they did not vary with the state in which a purchaser happened to live. Every Class Member was injured in the same way by the same Indiana-based course of conduct: each acquired an Annuity whose value depended on the financial strength of an insurer whose financial condition Defendants had misrepresented. Indiana has a strong interest in regulating the conduct of the insurer and insurance holding companies headquartered within its borders, an interest reflected in the Indiana Insurance Code's prohibition of unfair and deceptive insurance practices, Ind. Code §27-4-1-4. And no Defendant can claim unfair surprise from the application of the law of the State in which it chose to locate its headquarters and from which it directed the conduct at issue.

79. Florida statutory law applies only to the claims of the Florida Subclass. Plaintiff asserts Count VIII, under the Florida Securities and Investor Protection Act, solely on behalf of himself and the Florida Subclass. Plaintiff likewise relies on the Florida Insurance Code, including Part IX of Chapter 626, Florida Statutes, as a source of Defendants' duties and of the standard of conduct against which their conduct is measured only as to the Florida Subclass. Plaintiff does not seek to apply any Florida statute to the claims of Class Members who purchased their Annuities while residing outside Florida.

80. In the alternative, should the Court determine that the law of a State other than Indiana governs any claim of any Class Member, the common law of fraudulent concealment, fraud in the inducement, breach of contract and of the implied covenant of good faith and fair dealing, and unjust enrichment does not vary among the States in any respect material to this case,

and any variations that do exist can be managed through grouped jury instructions or the certification of additional state subclasses.

## CLASS ACTION ALLEGATIONS

81. As used herein, the "Class Period" means the period from January 1, 2024 through June 26, 2026, inclusive. The Class Period begins on the first day of the year in which Delaware Life's year-end statutory statements first understated its related-party investments by billions of dollars—Delaware Life has itself reclassified approximately $9.53 billion of private-credit investments held as of December 31, 2024, as "predominantly contingent on the performance of affiliates"—and ends on the date Delaware Life first publicly disclosed the federal grand jury subpoenas. Plaintiff alleges on information and belief that the misclassification existed throughout that period and began earlier; the precise commencement date is within Defendants' exclusive knowledge and Plaintiff reserves the right to seek to amend the Class Period to conform it to the evidence.

82. Plaintiff brings this action on behalf of himself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:

> All persons and entities who, during the Class Period, purchased or exchanged into an annuity issued by Delaware Life Insurance Company, including a fixed or fixed index annuity or associated income rider, and who received or were provided Defendants' standardized contract, disclosure, illustration, or point-of-sale materials representing that the annuity's guarantees were backed by the issuing insurer's financial strength and claims-paying ability, including the Florida Subclass (the "Nationwide Class").

83. Plaintiff also brings this action on behalf of the following class:

> All persons and entities who, during the Class Period and while residing in the State of Florida, purchased or exchanged into an annuity issued by Delaware Life Insurance Company, including a fixed or fixed index annuity or associated income rider, and who received or were provided Defendants' standardized contract, disclosure, illustration, or point-of-sale materials representing that the annuity's

guarantees were backed by the issuing insurer's financial strength and claims-paying ability (the "Florida Subclass").

84. Plaintiff further brings this action on behalf of the following subclass:

> All members of the Nationwide Class whose annuity was issued by Delaware Life Insurance Company on or after February 1, 2026 and whose contractual or statutory right to return the contract for an unconditional refund of premium expired on or before June 26, 2026 (the "Post-Subpoena Purchaser Subclass").[4]

85. Excluded from the Class are: (a) Defendants, their officers, directors, and employees; (b) any entity in which any Defendant has a controlling interest; (c) the affiliates, legal representatives, attorneys, heirs, and assigns of any Defendant; (d) members of the judiciary to whom this action is assigned and any member of their immediate families; (e) all persons who properly and timely elect to be excluded from the Class; and (f) all persons who have previously released claims encompassed by this action.

**Numerosity**

86. Upon information and belief, the Class consists of tens of thousands of annuity purchasers nationwide; Delaware Life reports more than 380,000 active annuity and life policies, and the Florida Subclass and the Post-Subpoena Purchaser Subclass each number, at a minimum, in the hundreds. The Class is so numerous that joinder of all members is impracticable. The precise number of Class Members is within the knowledge of Defendants and can be ascertained through discovery.

---

[4] For ease of reference, the Nationwide Class, the Florida Subclass, and the Post-Subpoena Purchaser Subclass are referred to herein collectively as the "Class," and their members as "Class Members."

**Ascertainability**

87. The Class is ascertainable by reference to objective criteria contained in Defendants' own business records. Every element of the Class definition—the identity of the issuing insurer, the product purchased, the date of issue and delivery, the purchaser's state of residence at issue, and the standardized forms delivered—appears in Defendants' administration files, which insurers are required to create and retain. No individualized inquiry is required to determine membership.

**Commonality**

88. There are questions of law and fact common to all Class Members that predominate over any individual questions. These common questions include, but are not limited to:

(a) whether Defendants offered, sold, or caused Class Members to exchange into Delaware Life Annuities and related income riders based on representations concerning the issuing insurer's financial strength and claims-paying ability;

(b) whether the TruePath Income Annuity, its GLWB rider, and materially similar Annuities or riders, are insurance products and Annuity contracts regulated under the Indiana Insurance Code, and under the materially identical insurance codes of the other states in which they were sold, and, as to the Florida Subclass, under Florida's Insurance Code, including Part IX of Chapter 626;

(c) whether Indiana common law governs the claims of the Nationwide Class;

(d) whether Defendants represented that Annuity guarantees, including guaranteed lifetime income, were backed by Delaware Life's financial strength and claims-paying ability;

(e) whether Defendants used representations concerning guaranteed lifetime income and enhanced rider benefits, including chronic illness income protection, to induce purchases or exchanges into the Annuities;

(f) whether Defendants reported or represented that approximately 3% of Delaware Life's investments were related-party investments while the actual concentration was approximately 39% to 42%, or at least approximately $16.37 billion;

(g) whether Defendants knowingly filed false material statements as to Delaware Life's financial condition with insurance regulators, and whether those filings were the source of the financial-strength representations conveyed to purchasers;

(h) whether Defendants possessed superior knowledge of the true related-party concentration and uniformly concealed or omitted it from purchasers and exchange participants;

(i) whether Defendants owed a duty to disclose the true related-party concentration, arising from their superior and exclusive knowledge, from their affirmative representations concerning financial strength and claims-paying ability, and from the applicable insurance codes;

(j) whether the concealed concentration and related-party conflicts rendered Defendants' financial-strength, claims-paying-ability, and lifetime-income representations materially misleading;

(k) whether Defendants' uniform representations and omissions concerning guaranteed income and the issuing insurer's financial strength and claims-paying ability, including the omission of the true related-party concentration, violated the standards of conduct established by Indiana Code Section 27-4-1-4 and the parallel provisions of other states' unfair-insurance-

trade-practices statutes and, as to the Florida Subclass, by Florida Statutes Section 626.9541(1)(a), including subparagraphs (1), (4), and (6), and Section 626.9541(1)(b) and (e);

(l) whether Defendants engaged in twisting or otherwise effected replacement transactions through misrepresentation or omission in violation of the standards of conduct established by Indiana Code Section 27-4-1-4(a)(1)(E) and, as to the Florida Subclass, by Florida Statutes Section 626.9541(1)(l) and (1)(a)(6);

(m) whether Defendants' concealment continued through and beyond the unconditional refund period mandated by Florida Statutes Section 626.99, by the free-look statutes of other states, and provided in Defendants' own contracts, and whether Plaintiff and members of the Post-Subpoena Purchaser Subclass were thereby deprived of the right to return their contracts for a full refund of premium;

(n) whether Walter, Guggenheim, TWG, and Group 1001 had a general awareness that their respective roles were part of an overall improper activity and provided substantial assistance to it;

(o) whether the Non-Issuer Defendants agreed among themselves and with Delaware Life to misreport the insurers' related-party concentration, and committed overt acts to conceal the true nature of these transactions in furtherance of that agreement;

(p) whether Defendants' refusal to release purchasers from their contracts without payment of surrender charges and Market Value Adjustments, after the concealment was revealed, breached the implied covenant of good faith and fair dealing;

(q) whether Defendants were unjustly enriched by the retention of premiums, surrender charges, and Market Value Adjustments, and by the deployment of policyholder assets as financing for Walter-related businesses;

(r) whether the Annuities sold to members of the Florida Subclass are "securities" within the meaning of Chapter 517, Florida Statutes, and whether Defendants sold them by means of untrue statements or omissions of material fact in violation of Florida Statutes Section 517.301;

(s) whether Class Members are entitled to rescission and return of premium without surrender charges, compensatory or other damages, and other relief under Indiana common law and, as to the Florida Subclass, Chapter 517, Florida Statutes;

(t) whether the concealed information was material to a reasonable annuity purchaser, and whether reliance on Defendants' uniform representations and omissions may be presumed or inferred Class-wide from the materiality of the omission and the standardized character of Defendants' forms;

(u) whether Defendants breached applicable Annuity contracts and riders, or the implied covenant of good faith and fair dealing, by failing to provide the promised benefits as represented and concealing material information affecting the guarantees;

(v) whether the Annuity disclosure and contract terms impose surrender charges and free-withdrawal limits, including a first-year 10% charge and the declining ten-year schedule, and whether those charges impede rescission or return of premium or whether charges incurred after June 26, 2026, should be returned;

(w) whether Plaintiff and Class Members suffered damages from the concealed concentration and misleading guarantee representations, and the appropriate measure of compensatory, rescissionary, and other damages; and

(x) the appropriate declaratory, injunctive, rescission, return-of-premium, return-of-penalties, interest, fee, and other relief available to Plaintiff and the Class.

**Typicality**

89. Plaintiff's claims are typical of the claims of the Class Members. Plaintiff applied for and accepted the TruePath Income Annuity in Miami-Dade County after being shown Defendants' standardized forms representing $181,677 in joint lifetime income, the chronic illness multiplier, rider fees, and surrender charges, and Delaware Life's financial strength and claims-paying ability. He was harmed by the same concealment of approximately 39% to 42% related-party concentration alleged on behalf of the Class and seeks the same rescission, return of premium, and damages. Plaintiff is a member of the Nationwide Class, the Florida Subclass, and the Post-Subpoena Purchaser Subclass, and his claims are typical of each.

**Adequacy of Representation**

90. Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained counsel who are experienced in class action and complex securities and consumer litigation. Plaintiff's interests are not antagonistic to, and do not conflict with, the interests of the Class Members. Plaintiff has no interests that are adverse to the Class.

**Predominance**

91. Common questions of law and fact predominate over any questions affecting only individual Class Members. The central issues in this case—whether Defendants marketed Annuities based on financial-strength and claims-paying-ability representations, whether the true approximately 39% to 42% related-party concentration was concealed, whether that omission made the guarantees misleading, whether the Annuity sales and the related misrepresentations and omissions violated the standards of conduct established by the Indiana Insurance Code and, as to the Florida Subclass, Florida's Insurance Code, including Part IX of Chapter 626, whether Defendants breached applicable contracts and riders, and whether Class Members are entitled to

rescission and return of premium without surrender charges—are common to all Class Members and can be resolved on a Class-wide basis.

92. The Annuity-sale transactions and the misrepresentations and omissions were common across the Class because Defendants used standardized annuity applications, disclosure statements, illustrations, contracts, and marketing materials to present lifetime-income benefits and insurer-backed guarantees while omitting the true related-party concentration. Whether those materials and conduct violated the standards of conduct established by the Indiana Insurance Code and, as to the Florida Subclass, Section 626.9541 of Florida's Insurance Code, whether Defendants are liable under Indiana common law, and whether Class Members are entitled to rescission, return of premium, or damages can therefore be determined on a Class-wide basis, subject to any individualized remedies issues.

93. The application of a single body of law to the Nationwide Class is appropriate and does not defeat predominance. For the reasons alleged above, Indiana common law governs the claims of the Nationwide Class, and Florida statutory law applies only to the claims of the Florida Subclass; in the alternative, any variation in the governing law can be managed through grouped jury instructions or state subclasses. In any event, the claims of the Post-Subpoena Purchaser Subclass turn on a single course of conduct—Defendants' decision to keep selling while concealing the subpoenas—that is identical for every Subclass member.

**Superiority**

94. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications and would impose individual burdens that are disproportionate to the common relief sought. A class action presents far fewer

management difficulties than individual litigation and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

95. This action is also properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Class as a whole, including a declaration that surrender charges and Market Value Adjustments may not be enforced against Class Members who elect to rescind contracts procured by Defendants' concealment.

## CAUSES OF ACTION

### COUNT I
### Fraudulent Concealment and Nondisclosure in the Solicitation, Sale, and Replacement of Insurance
### (On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)

96. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

97. Plaintiff brings this Count under Indiana common law on behalf of himself and the Nationwide Class, including the Florida Subclass and the Post-Subpoena Purchaser Subclass. The allegations of this Count concerning the Florida Insurance Code are made on behalf of Plaintiff and the Florida Subclass only.

98. The TruePath Income Annuity—a modified single premium deferred fixed index annuity with index-linked options issued by Delaware Life, a life insurer—and its associated GLWB rider, as well as materially similar Annuities and riders offered or sold to Class Members, are an "annuity contract" and an "insurance policy" or insurance product within the meaning and regulatory scope of Florida's Insurance Code and of the insurance codes of the other states in which they were sold. The Annuities are subject to Florida's insurance regulatory framework,

including oversight by the FLOIR and the DFS and applicable insurer and insurance-agent licensing requirements.

99. Delaware Life is an "insurer" within the meaning and regulatory scope of Florida's Insurance Code. Walter, Group 1001, TWG, and Guggenheim participated in, directed, approved, or materially aided the conduct and transactions alleged herein, as described above and below.

100. Under Indiana law, which governs this Count as to the Nationwide Class, the standard of conduct against which Defendants' concealment is measured is supplied by the Indiana Insurance Code's prohibition of unfair and deceptive acts and practices in the business of insurance, Indiana Code Section 27-4-1-4, which governs the conduct of the Zionsville, Indiana headquarters from which Delaware Life prepared its statutory statements and drafted, approved, and disseminated the standardized sales materials at issue. Section 27-4-1-4(a) defines as unfair and deceptive, among other things: misrepresenting the terms of any policy or the benefits or advantages it promises; making any misleading representation or misrepresentation as to the financial condition of any insurer or the legal reserve system upon which any life insurer operates; making any misrepresentation to a policyholder for the purpose of inducing the policyholder to lapse, forfeit, or surrender existing insurance; placing before the public any untrue, deceptive, or misleading statement with respect to the conduct of an insurance business; and, with intent to deceive, filing with a public official any false statement of an insurer's financial condition, or making false entries in, or omitting true entries of material fact from, an insurer's books, reports, or statements. Ind. Code §27-4-1-4(a)(1)(A), (a)(1)(C), (a)(1)(E), (a)(2), (a)(5). Plaintiff does not contend that Section 27-4-1-4 creates a private right of action. It establishes the standard of conduct against which Defendants' common-law duties are measured. The unfair-insurance-trade-practices

statutes of the other states in which Class Members purchased their Annuities prohibit the same conduct in materially identical terms.

101. As to Plaintiff and the Florida Subclass, Florida's Insurance Code independently supplies the same standard of conduct. Part IX of Chapter 626, Florida Statutes (Sections 626.951–626.99), is the "Unfair Insurance Trade Practices" part. Section 626.951(1) declares its purpose "to regulate trade practices relating to the business of insurance" by defining, or providing for the determination of, practices in Florida that constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

102. Section 626.9521 prohibits any person from engaging in this state in any trade practice defined in Part IX, or determined pursuant to Section 626.951 or Section 626.9561 to be, an unfair method of competition or an unfair or deceptive act or practice involving the business of insurance.

103. Section 626.9531, concerning identification of insurers, agents, and insurance contracts, forms part of that regulatory framework. Defendants' applications, disclosures, illustrations, contracts, and sales materials identified the insurance companies, the agent, and the Annuities, but the conduct alleged herein undermined the accurate insurance disclosures required by that framework.

104. Section 626.9641, the Policyholders' Bill of Rights, recognizes that policyholders are entitled to insurance advertising and other selling approaches that provide accurate and balanced information on the benefits and limitations of a policy and to an insurance company that is financially stable. Defendants' conduct deprived Plaintiff and Class Members of those protections in connection with their Annuity transactions.

105. Section 626.9541(1)(a), entitled, "Misrepresentations and false advertising of insurance policies," defines as an unfair or deceptive act knowingly making, issuing, circulating, or causing to be made, issued, or circulated any estimate, illustration, circular, statement, sales presentation, omission, comparison, or property and casualty certificate of insurance altered after being issued, which: (1) "[m]isrepresents the benefits, advantages, conditions, or terms of any insurance policy"; (4) "[i]s misleading, or is a misrepresentation, as to the financial condition of any person or as to the legal reserve system upon which any life insurer operates"; or (6) "[i]s a misrepresentation for the purpose of inducing, or tending to induce, the lapse, forfeiture, exchange, conversion, or surrender of any insurance policy."

106. Section 626.9541(1)(b), entitled, "False information and advertising generally," defines as an unfair or deceptive act knowingly making, publishing, disseminating, circulating, or placing before the public, or causing to be so placed, in any form or by any means, "an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance, which is untrue, deceptive, or misleading."

107. Section 626.9541(1)(e), entitled, "False statements and entries," defines as an unfair or deceptive act knowingly filing with any supervisory or other public official, or making, publishing, disseminating, circulating, delivering to any person, or placing before the public, "any false material statement"; and "[k]nowingly making any false entry of a material fact in any book, report, or statement of any person, or knowingly omitting to make a true entry of any material fact pertaining to the business of such person in any book, report, or statement of such person." This provision addresses the conduct at the heart of this action. Delaware Life reported to insurance regulators that its related-party investments were approximately 3% of invested assets, or approximately $1.4 billion. That statement was false and material. Its own restatement, made only

after federal grand jury subpoenas compelled an internal investigation, put the figure at approximately $16.37 billion at December 31, 2025, and approximately 42% of invested assets in the reclassified audited 2025 financial statements. The false regulatory statement was not collateral to the sale; it was the foundation of the financial-strength representation that Defendants placed at the center of every point-of-sale document delivered to Plaintiff and the Class.

108. Section 626.9541(1)(l), entitled, "Twisting," defines as an unfair or deceptive act "[k]nowingly making any misleading representations or incomplete or fraudulent comparisons or fraudulent material omissions of or with respect to any insurance policies or insurers for the purpose of inducing, or tending to induce, any person to lapse, forfeit, surrender, terminate, retain, pledge, assign, borrow on, or convert any insurance policy or to take out a policy of insurance in another insurer." Rosner's transaction was effected as a replacement or 1035 exchange out of an existing Jackson National annuity and into a Delaware Life Annuity. Defendants supplied the comparison—on Florida's mandated Disclosure and Comparison of Annuity Contracts form and on Delaware Life's own Consumer Profile—and that comparison was materially incomplete because it weighed the two insurers' products against one another while omitting the single fact that most bore on the value of the Delaware Life guarantee: that the insurer standing behind it had misreported its related-party concentration by an order of magnitude and was under federal grand jury subpoena for it.

109. Defendants' conduct falls within Indiana Code Section 27-4-1-4(a)(1)(A), (a)(1)(C), (a)(1)(E), (a)(2), and (a)(5), within the parallel provisions of other states' statutes, and, as to the Florida Subclass, within Section 626.9541(1)(a)1, (1)(a)4, (1)(a)6, (1)(b), (1)(e), and (1)(l). The $181,677 guaranteed joint lifetime income representation misrepresented the benefits and terms of the Annuities. Defendants' concealment of Delaware Life's approximately 39% to

42% related-party concentration—at least approximately $16.37 billion—versus the approximately 3% figure previously reported or represented was misleading and a misrepresentation as to Delaware Life's financial condition and the legal reserve system upon which it operates, bearing directly on the insurer's financial strength and claims-paying ability. Delaware Life's own comparison form records what Rosner gave up: a contract that had exited its surrender period entirely, with a surrender charge at exchange of $0.00, a death benefit, and an established Guaranteed Withdrawal Balance of $995,594.22. In exchange, he received a new ten-year surrender period beginning at 10%, plus exposure to a Market Value Adjustment.

110. As to the Florida Subclass, Section 626.9631 provides that the provisions of Part IX are cumulative to rights under the general civil and common law and that no action of the department, commission, or office shall abrogate those rights to damages or other relief in any court. Plaintiff does not assert that Section 626.9541(1)(a) creates a freestanding private right of action; rather, Defendants' Insurance Code violations establish the wrongful conduct and standard of conduct underlying the common-law claims of Plaintiff and the Florida Subclass and support the damages, rescission, return-of-premium, and other relief preserved and remediable through Section 626.9631 and the common law.

111. Defendants owed Plaintiff and Class Members a duty to disclose the true related-party concentration and the pendency of the federal grand jury subpoenas. That duty arose independently from three sources.

(a) ***First***, Defendants had superior and, as a practical matter, exclusive knowledge of Delaware Life's true financial condition; Delaware Life is not a public reporting company, and its condition was knowable to consumers only through the statutory filings Defendants themselves rendered false.

(b) ***Second***, having elected to speak about Delaware Life's financial strength and claims-paying ability—and having made that subject the express foundation of every guarantee they sold—Defendants assumed a duty to speak fully and truthfully about it, and could not tell a half-truth that created a materially false impression.

(c) ***Third***, the Indiana Insurance Code, the insurance codes of the other states in which the Annuities were sold, and, as to the Florida Subclass, the Florida Insurance Code impose on insurers affirmative disclosure obligations in the sale and replacement of annuities, including under Indiana Code Section 27-4-1-4 and, as to the Florida Subclass, Florida Statutes Sections 626.9541(1)(a)-(b), (e), and (l), 626.9641, 626.99, and 627.4554, and the replacement and comparison forms Defendants themselves delivered; and the Delaware Insurance Holding Company System Regulatory Act and NAIC statutory accounting principles required Delaware Life to report its affiliated investments truthfully in the statutory statements on which every financial-strength rating and representation depended.

112. Defendants made statements and omissions concerning the Annuities' guaranteed income, the financial strength of the issuing insurer, and their claims-paying ability. Those statements and omissions were false or misleading when made because Defendants materially understated the related-party concentration as approximately 3% while the true concentration was approximately 39% to 42%, or at least approximately $16.37 billion, and because the concealed concentration bore directly on Delaware Life's financial strength and ability to pay claims.

113. The guaranteed-income, financial-strength, and claims-paying-ability representations and omissions were material to a reasonable purchaser of an annuity. Defendants knew or should have known of the falsity and misleading nature of those representations and omissions because of their superior knowledge of Delaware Life's assets, related-party

relationships, reserves, and ability to perform its guarantees. As to the period on and after February 2026, Defendants had actual knowledge: they had been served with federal grand jury subpoenas directed at the very classification they were representing to purchasers, and they concealed both the subpoenas and the underlying misclassification while continuing to sell.

114. Plaintiff and Class Members relied on, and were induced by, Defendants' representations and omissions to purchase or exchange into the Annuities and to pay or apply premiums. Plaintiff applied or tendered an issued-contract Initial Premium of $1,013,590.14, and placed his existing Jackson annuity and associated benefits at risk of replacement. Because the omissions at issue were uniform, material, and made by parties with a duty to disclose, reliance may be presumed on a Class-wide basis.

115. As a direct and proximate result, Plaintiff and Class Members were damaged, including through premiums paid or applied, surrender charges and Market Value Adjustment charges actually paid or, for Class Members still holding their contracts, presently owed (charges already incurred), and other withdrawal restrictions, loss of the benefit of their bargain, loss of the unconditional right to return the contract for a full refund of premium, and loss of the opportunity to make informed annuity decisions.

116. Plaintiff and Class Members are entitled to rescission and return of the premium paid or applied, without deduction (or repayment) of surrender charges, Market Value Adjustment, or other penalties. Class Members who have already surrendered, including Plaintiff, are entitled to restitution of the surrender charges, Market Value Adjustments, and other amounts deducted on surrender.

117. Plaintiff and Class Members further seek compensatory damages and, for Defendants' knowing and willful conduct, punitive damages, together with pre- and post-judgment

interest and reasonable attorneys' fees and costs to the extent available by law. Plaintiff does not rely on Florida Statute Section 624.155 as a civil remedy for the Insurance Code violations alleged in this Count and does not assert that Section 624.155 creates a private right of action for Section 626.9541(1)(a).

118. As a direct and proximate result of Defendants' fraudulent concealment and nondisclosure, Plaintiff and the Class have been damaged and are entitled to rescission and return of premium without surrender charges, compensatory and punitive damages, interest, and reasonable attorneys' fees and costs, together with such other relief as this Court deems just and proper.

## COUNT II
## Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing
## (On Behalf of Plaintiff and the Nationwide Class, Against Delaware Life)

119. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

120. Plaintiff and Class Members entered into binding annuity contracts with Delaware Life, including Rosner's TruePath Income Annuity and its GLWB rider, in connection with their purchases or exchanges.

121. The Annuity Contract and GLWB Rider set forth Delaware Life's obligations to provide a joint GLWB for Rosner and his wife, including an Annual Withdrawal Amount and lifetime income subject to the rider's conditions, and specified the applicable 1.20% rider fee and withdrawal and surrender-charge terms. The application and illustration represented a guaranteed annual joint income of $181,677, and the disclosure materials represented that guarantees were backed by Delaware Life's financial strength and claims-paying ability. Plaintiff pleads these

writings together or, in the alternative, as separate contractual and tort representations as permitted by law.

122. The Annuity Contracts and riders of all Defendants' Annuities set forth the same obligations owed to Class Members as Rosner and his wife, and made the same representations that guarantees were backed by Delaware Life's financial strength and claims-paying ability.

123. Under Indiana law, which governs this Count as to the Nationwide Class, there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured, and that duty includes the obligation to refrain from deceiving the insured. The Annuities are insurance contracts issued by a life insurer, and the implied covenant of good faith and fair dealing they carry bars Delaware Life from acting in a manner that destroys or injures Class Members' right to receive the fruits of their contracts and governs the exercise of any discretion the contracts confer. Delaware Life breached that covenant by: (a) issuing and administering contracts whose central promise was expressly conditioned on its own financial strength while knowingly misreporting the composition of the assets supporting that strength; (b) allowing the contractual and statutory unconditional refund period to expire without disclosing the federal grand jury subpoenas it had received before the contracts were even applied for; and (c) invoking, or reserving the right to invoke, the withdrawal and surrender charge schedule and the Market Value Adjustment to penalize Class Members who seek to exit contracts procured by that concealment.

124. Delaware Life breached by issuing and administering Plaintiff's and Class Members' Annuities while concealing the material concentration that directly affected the financial-strength and claims-paying-ability basis of the promised guarantees, and by failing to honor the guaranteed joint-income and GLWB obligations as represented.

125. The contracts' ten-year surrender-charge schedule—including a 10% first-year charge for withdrawals or surrender beyond the free-withdrawal amount, together with the Market Value Adjustment—impedes and impeded Plaintiff's and Class Members' ability to unwind the transaction. If Delaware Life contends that these charges apply to rescission or return of premium after its material breach and concealment, that position further breaches the contract and its implied covenant; in any event, Plaintiff seeks return of the premium without those charges or return of both the premium and surrender charges.

126. Plaintiff and Class Members have performed all conditions, covenants, and obligations required of them under the applicable Annuity contracts and riders, or such performance has been excused by Delaware Life's material breach.

127. Delaware Life further breached the implied covenant when it refused a written request to release Plaintiff from a contract it had obtained by concealment, and instead invoked the contract's own penalty provisions to charge him for leaving. It has taken the same position as to every Class Member. A party may not procure a contract by concealing material facts it is bound to disclose and then invoke that contract's exit charges to profit from the victim's discovery of the truth.

128. As a direct and proximate result of Delaware Life's breach of the applicable Annuity contracts and riders and of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered damages, including, but not limited to, the loss of the benefit of their bargain, the premium paid or applied, the withdrawal and surrender charges and Market Value Adjustment charges Delaware Life assessed on exit or that Class Members must pay in order to exit, diminution in the value and recoverability of their annuities, and other damages to be proven.

**COUNT III**
**Fraud in the Inducement / Fraudulent Misrepresentation**
**(On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

129. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

130. Defendants made material representations of fact to Plaintiff in connection with the solicitation and sale of the TruePath Income Annuity, an insurance product and annuity contract, and, upon information and belief, made materially similar representations to Class Members. On or about April 1, 2026, through the application, client acknowledgment, product disclosure, and illustrations, Defendants represented that the Annuity would provide guaranteed joint lifetime income of $181,677 per year for Rosner and his wife, that Rosner could activate the income rider at approximately age 77, and that the Annuity offered a chronic illness multiplier not available under his Jackson policy. The materials also disclosed a 1.20% GLWB rider fee, a ten-year declining surrender schedule, and that all guarantees were backed by Delaware Life's financial strength and claims-paying ability.

131. These representations were made or repeated by Defendants through their officers, agents, and approved sales materials, including Delaware Life's application and disclosure materials and the materials used and relied on by Rosner at or before Rosner's April 1 application and through issuance and delivery of the Annuity.

132. Defendants' representations were materially misleading when made because they conveyed that Delaware Life's financial strength supported the lifetime guarantees while omitting the true allocation of assets to Walter-related entities. Upon information and belief, at the time Defendants represented the Annuity's guaranteed income and claims-paying-ability backing, they

knew or recklessly disregarded that the related-party concentration was approximately 40%, while the approximately 3% figure had been reported or represented to regulators and the public.

133. Delaware Life received federal grand jury subpoenas in February 2026—before Plaintiff applied, before the contract issued, and before it was delivered—directed at whether private-credit investments introduced by an affiliate should have been treated as related-party transactions. Defendants therefore knew, throughout Plaintiff's entire transaction, that the classification underlying their financial-strength representations was under federal criminal scrutiny. They continued to sell, and said nothing. Scienter is further supported by the magnitude of the discrepancy (approximately 3% reported against approximately 42% restated, a difference exceeding $15 billion and roughly four times Delaware Life's entire capital and surplus); by the structural character of the misclassification, which required the interposition of nominally unaffiliated intermediaries between the insurer and the ultimate economic exposure; by Walter's control of both the insurers and the entities on the other side of the transactions; by the 2014 policyholder lawsuit that put Walter and his insurers on notice of the same conduct more than a decade earlier; and by the placement of former Guggenheim private-credit personnel in Delaware Life's investment function.

134. Defendants made and repeated these representations and omissions with the intent to induce Rosner and Class Members to purchase or exchange into Delaware Life annuities and to tender their premiums. Defendants knew that the represented joint lifetime income, chronic illness feature, and financial-strength-backed guarantees were material to decisions whether to replace an existing annuity and commit retirement assets to Delaware Life.

135. Rosner relied on Defendants' representations and omissions in deciding to replace or exchange his Jackson annuity and to apply or tender an Initial Premium of $1,013,590.14. Had

Rosner known the true related-party concentration and its bearing on Delaware Life's guarantees, he would not have proceeded with the transaction. Rosner's reliance was reasonable. Delaware Life is not a public reporting company; the only public information about its financial condition derives from the statutory filings Defendants rendered false and the ratings built upon them. The law of every state presumes the asymmetry, which is why it obligates insurers to disclose. And Defendants directed Plaintiff's attention to the insurer's financial strength as the foundation of every guarantee they sold.

136. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiff and Class Members have suffered damages, including, but not limited to, the premium paid or applied, the Annuities' withdrawal and surrender charges and Market Value Adjustments actually paid or presently owed, the forfeiture, upon surrender, of the guaranteed lifetime income for which they paid, loss of the benefit of their bargain, loss of alternative retirement-income opportunities, loss of the unconditional right to return the contract for a full refund, and the risk of losing benefits associated with an existing annuity exchanged or replaced in reliance on Defendants' inducements.

137. Defendants' conduct was willful, wanton, and undertaken with conscious disregard for the rights of Plaintiff and Class Members. Defendants' fraudulent scheme was designed to enrich Walter and his related entities by causing insurers' assets supporting annuity guarantees to be concentrated in Walter-related entities while purchasers were told that Delaware Life's financial strength and claims-paying ability backed their lifetime income. Plaintiff and Class Members are therefore entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

**COUNT IV**
**Negligent Misrepresentation**
**(In the Alternative, On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

138. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

139. In the alternative to Count III, and to the extent Defendants' misrepresentations were not made knowingly or with intent to deceive, Defendants negligently misrepresented the Annuities' guaranteed joint income and rider benefits, Delaware Life's financial-strength and claims-paying ability, and the related-party concentration, and negligently omitted the true concentration from the information supplied to Plaintiff and Class Members.

140. Defendants owed a duty of care to Plaintiff and Class Members to provide accurate information regarding the Annuities' benefits, fees, withdrawal restrictions, financial-strength and claims-paying-ability backing, and related-party concentration. This duty arose from the parties' contractual relationship, Defendants' superior knowledge of the insurer's portfolio and guarantees, and the trust and confidence that purchasers placed in Defendants as insurers, asset managers, and professional financial participants. The duty is independently imposed by the Indiana Insurance Code, including Indiana Code Section 27-4-1-4, by the materially identical insurance codes of the other states in which the Annuities were sold, and, as to the Florida Subclass, by the Florida Insurance Code, including Sections 626.9541(1)(a)-(b), (e), and (l), 626.9641, and 627.4554, which establish the standard of conduct governing an insurer's communications with annuity purchasers and which exist for the protection of the class of persons to which Plaintiff belongs.

141. Defendants breached their duty of care by supplying or approving information that emphasized guaranteed joint lifetime income, chronic illness protection, and financial-strength-backed guarantees while failing to disclose the approximately 39% to 42% related-party

concentration and the approximately 3% figure reported to regulators and the public. Defendants failed to exercise reasonable care in ascertaining or communicating the true concentration and its significance to the ability to pay claims.

142. Defendants supplied materially similar information to Plaintiff and Class Members for the guidance of their annuity purchase and exchange decisions. Defendants knew, or should have known, that purchasers would rely on representations concerning guaranteed lifetime income and the insurer’s financial strength and claims-paying ability in deciding whether to commit premiums and replace existing annuities.

143. Plaintiff and Class Members reasonably relied on Defendants’ representations and omissions. Such reliance was reasonable given Defendants’ position as insurers and professional asset managers, their superior access to information regarding the true related-party concentration and claims-paying ability, and the fact that purchasers had no independent means of verifying the insurer’s portfolio allocations when making their annuity decisions.

144. As a direct and proximate result of Defendants’ negligent misrepresentations and omissions, Plaintiff and Class Members have suffered damages, including, but not limited to, the premium paid or applied, exposure to the Annuities’ withdrawal and surrender charges and Market Value Adjustments, loss of alternative retirement-income opportunities, loss of the benefit of the bargain, and other damages to be proven.

## COUNT V
## Aiding and Abetting Fraud
## (On Behalf of Plaintiff and the Nationwide Class, Against the Non-Issuer Defendants)

145. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

146. This Count is asserted against the Non-Issuer Defendants. It is not asserted against Delaware Life, which is the primary wrongdoer whose fraud these Defendants aided and abetted.

147. An underlying fraud occurred. As alleged in Counts I and III, Delaware Life misrepresented its financial condition to insurance regulators and to purchasers, concealed both the true scale of its related-party concentration and the February 2026 federal grand jury subpoenas directed at that very classification, and thereby induced Plaintiff and Class Members to purchase and exchange into the Annuities and to tender their premiums.

148. Each of the Non-Issuer Defendants had knowledge of that fraud or, at minimum, a general awareness that its own role was part of an overall improper activity. Plaintiff is not required to allege that any of them knew the particulars of the misstatements made to any individual purchaser.

149. Walter sat on both sides of every transaction at issue. He controlled the insurers whose policyholder assets were lent and, directly or indirectly, the businesses to which those assets were lent, and he is the CEO of the asset manager that introduced the investments. No person was better positioned to know that assets reported to regulators as unaffiliated were, in economic substance, his own. Walter had, moreover, been personally named in a 2014 policyholder class action alleging that insurers he controlled had used policyholder funds to finance his Dodgers acquisition while obscuring their affiliated investments in regulatory filings.

150. TWG is the holding company through which that dual control was exercised and, upon information and belief, the ultimate beneficiary of the financing the insurers supplied. Its awareness is confirmed by its own conduct: in August 2026 TWG agreed to swap up to $6.5 billion of Delaware Life's related-party investments for assets classified as independent, it—rather than Delaware Life—issued the public statement denying that any fraud had occurred at the insurers,

and Walter offered to pledge his equity in Guggenheim as collateral to raise cash to reduce affiliated assets on the insurers' balance sheets. A holding company does not undertake a multibillion-dollar remediation of a condition it believed to be immaterial or unknown to it.

151. Group 1001 Insurance Holdings, LLC and Group 1001, Inc. own and direct Delaware Life, and "Group 1001" is the brand under which the Annuities were marketed. Delaware Life's own disclosure and application materials delivered to Plaintiff identify it as "a member of Group 1001," and its service address is 10555 Group 1001 Way, Zionsville, Indiana. These Defendants controlled the insurer whose statutory filings carried the false 3% figure and whose standardized sales materials carried the financial-strength representation to every purchaser, and Group 1001 issued the public assurances that Delaware Life's "capital position and liquidity remain strong" while the restatement was being prepared.

152. Guggenheim, upon information and belief, originated, introduced, structured, managed, or valued the private-credit investments Delaware Life has now reclassified as related-party investments; Delaware Life has stated that those investments were "introduced to Delaware Life and Clear Spring by an affiliate." Guggenheim personnel directed the insurers' investment function, and Delaware Life's Chief Investment Officer previously ran Guggenheim's Private Credit Group. Guggenheim Corporate Funding manages PDIF GCF CLO 2022-1, a collateralized loan obligation of approximately $438 million, of which, upon information and belief, Delaware Life owns the entire capital structure from the senior securities through the first-loss residual—an arrangement in which no independent investor sets a price at any level. The federal inquiry itself began with a whistleblower complaint from within Guggenheim Investments concerning the accounting for advisory contracts at Guggenheim Private Investments.

153. Each of the Non-Issuer Defendants rendered substantial assistance to the fraud. They designed, approved, funded, directed, or executed the transaction structures that interposed nominally unaffiliated intermediaries between the insurers and the ultimate economic exposure; they caused or permitted those transactions to be reported as unaffiliated in statutory filings; they controlled or advised the insurer whose filings carried the false 3% figure; and, possessing knowledge that the figure was false, they failed to correct it or to disclose the truth to purchasers at any time before Plaintiff's unconditional refund period expired on or about May 24, 2026.

154. The assistance was substantial in the most literal sense. Without the intermediary structures and the asset classification that flowed from them, the misreporting could not have been created or sustained; and without the misreporting, the financial-strength representation that Defendants placed at the center of every point-of-sale document could not have been made. The fraud was not merely facilitated by these Defendants' conduct. It was constituted by it.

155. That substantial assistance proximately caused Plaintiff's and Class Members' injuries. Plaintiff and Class Members purchased and exchanged into the Annuities on the strength of a financial-strength representation that was false only because of the structures these Defendants built and the classification they caused to be reported, and they suffered the injuries alleged above as a result.

156. Plaintiff and Class Members are entitled to compensatory damages, restitution, and punitive damages against the Non-Issuer Defendants, jointly and severally with Delaware Life.

**COUNT VI**
**Civil Conspiracy**
**(On Behalf of Plaintiff and the Nationwide Class, Against the Non-Issuer Defendants)**

157. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

158. This Count is asserted against the Non-Issuer Defendants. Delaware Life is alleged to be a co-conspirator but is not named as a defendant in this Count.

159. Two or more of the Non-Issuer Defendants, together with Delaware Life and the non-party intermediaries and Unnamed Co-Conspirators identified above, agreed to accomplish an unlawful purpose, or a lawful purpose by unlawful means: to deploy policyholder premiums held by Delaware Life as a source of financing for Walter-related businesses while reporting those investments to regulators, and representing to annuity purchasers, that the insurer's related-party exposure was approximately 3% of invested assets.

160. The object of the conspiracy was unlawful. It included the knowing filing of false material statements of an insurer's financial condition with supervisory officials, the making of false entries and the omission of true entries of material fact in the insurer's books, reports, and statements, and the misrepresentation of an insurer's financial condition in the solicitation and sale of annuities—that the Indiana Insurance Code prohibits at Indiana Code Section 27-4-1-4, that the insurance codes of every other state prohibit in materially identical terms, and, as to the Florida Subclass, that the Florida Insurance Code prohibits at Section 626.9541(1)(a)-(b), (e), and (l).

161. Defendants committed numerous overt acts in furtherance of the conspiracy, including: structuring and funding loans through the four intermediary entities reported as ABS Capital, Amistad Financial, Bradford Allen, and Hudson Trading Inc.; causing those loans to be classified and reported as unaffiliated in statutory filings; obtaining ratings on portfolio assets from a single small provider in a manner that supported favorable statutory capital treatment; drafting, approving, and distributing standardized sales and disclosure materials representing that annuity guarantees were backed by Delaware Life's financial strength and claims-paying ability; requiring appointed producers to certify that they used only those company-approved materials; soliciting

and issuing Annuities to Plaintiff and Class Members after receiving federal grand jury subpoenas concerning that very classification; remaining silent through the expiration of purchasers' unconditional refund periods; issuing public denials that any fraud had occurred; and refusing to release purchasers, including Plaintiff, from their contracts without payment of the penalties the scheme had made available.

162. This conspiracy is not barred by the intracorporate conspiracy doctrine. The conspirators are not a single corporate entity acting through its own agents. Guggenheim is a separate enterprise that is not a subsidiary of TWG or of Group 1001, and the four intermediary entities and other Unnamed Co-Conspirators are outside any corporate family shared with the insurer. In addition, Walter possessed an independent personal stake in achieving the object of the conspiracy: the loan proceeds funded businesses in which he holds personal economic interests, so that his participation served his own ends and not solely those of any corporation he served.

163. Plaintiff and Class Members suffered damage as a direct and proximate result of the overt acts committed in furtherance of the conspiracy, including the overpayment for, and diminished value of, the Annuities they purchased; the surrender charges and Market Value Adjustments assessed on those who have exited; and, for members of the Post-Subpoena Purchaser Subclass, the loss of their unconditional refund rights.

164. Each conspirator is jointly and severally liable for all acts committed by any co-conspirator in furtherance of the conspiracy, whether or not that conspirator personally committed the act, and Plaintiff and Class Members are entitled to compensatory and punitive damages accordingly.

**COUNT VII**
**Unjust Enrichment**
**(In the Alternative, On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

165. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein, and pleads this Count in the alternative to Count II to the extent any Annuity contract is found to be void, voidable, or unenforceable, or to the extent any Defendant is found not to be a party to it.

166. Plaintiff and Class Members conferred direct benefits on Defendants. They paid or applied premiums to Delaware Life and, in the case of those who have surrendered, including Plaintiff, paid surrender charges and Market Value Adjustments that Delaware Life retained. Those premiums, once inside Delaware Life's general account, were deployed as the source of financing for businesses affiliated with or controlled by Walter, TWG, Group 1001, and Guggenheim, which received the use of policyholder capital on terms that no independent lender negotiated.

167. Defendants had knowledge of those benefits and voluntarily accepted and retained them. Delaware Life retained the premiums and the exit charges; the Non-Issuer Defendants received the economic benefit of below-market, affiliate-directed financing funded with Class Members' retirement savings; and Guggenheim, upon information and belief, received fees for managing and introducing the investments.

168. Under the circumstances, it would be inequitable for Defendants to retain those benefits without paying their value to Plaintiff and the Class. The benefits were obtained by concealing from purchasers the very fact—the affiliated character of the assets backing their guarantees—that would have caused a reasonable purchaser to decline the transaction, and the exit

charges were extracted only because the concealment had first trapped Class Members inside the contracts.

169. Plaintiff and Class Members are entitled to restitution and disgorgement of all premiums, surrender charges, Market Value Adjustments, fees, and other benefits unjustly obtained and retained by Defendants, together with interest.

**COUNT VIII**
**Violation of the Florida Securities and Investor Protection Act, Florida Statutes Sections 517.301 and 517.211**
**(In the Alternative, On Behalf of Plaintiff and the Florida Subclass, Against Delaware Life and the Non-Issuer Defendants)**

170. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein. Plaintiff pleads this Count in the alternative, on behalf of himself and the Florida Subclass.

171. The Annuities are "securities" within the meaning of Florida Statutes Section 517.021. Chapter 517 defines "security" expansively to include, among other things, any investment contract, any certificate of interest or participation, any interest in or under a profit-sharing or participation agreement or scheme, and any other instrument commonly known as a security. Unlike the securities statutes of some other states, Chapter 517 does not exclude annuity contracts from the definition of "security"; it exempts annuity contracts issued by supervised insurers only from the registration requirements of Section 517.07, *see* Fla. Stat. §517.051, and the antifraud provisions of Section 517.301 and the civil remedies of Section 517.211 apply to exempt securities. The Annuities are investment contracts under Florida law: purchasers invested money in a common enterprise—Delaware Life's general account—with the expectation of profits, in the form of index-linked interest credits and guaranteed lifetime income, derived from the managerial and investment efforts of Defendants, and the value of what they purchased depended on the

composition and performance of a portfolio that Defendants alone selected and managed. Delaware Life's variable annuities are, in addition, registered with the SEC as securities.

172. Section 517.301(1)(a) makes it unlawful, in connection with the rendering of investment advice or the offer, sale, or purchase of any investment or security, directly or indirectly, to employ any device, scheme, or artifice to defraud; to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

173. In connection with the offer and sale of the Annuities to Plaintiff and the Florida Subclass, Delaware Life obtained money by means of untrue statements of material fact and omissions of material fact, as alleged above, including the representation that its guarantees were backed by its financial strength and claims-paying ability, made while it concealed that approximately 39% to 42% of the assets constituting that financial strength were related-party investments and, from February 2026 forward, that it was under federal grand jury subpoena for the classification of those assets. Delaware Life did so with scienter, or at minimum with negligence, which suffices under Section 517.301.

174. Under Florida Statutes Section 517.211(2), any person selling a security in violation of Section 517.301, and every director, officer, partner, or agent of or for the seller who personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold it. Walter, TWG, Group 1001, and Guggenheim personally participated in and aided the sales at issue by controlling the insurer, by designing and directing the investment structures whose

misclassification rendered the sales materials false, by approving the standardized materials through which every sale was made, and by causing Delaware Life to continue selling after the subpoenas were served.

175. Plaintiff, who has surrendered his Annuity, is entitled to damages under Section 517.211(3), measured by the difference between the amount he paid for the Annuity and the amount he received upon surrender, together with interest at the legal rate from the date of purchase. Florida Subclass members who still hold their Annuities are entitled to rescission and recovery of the consideration paid, with interest, upon tender. Plaintiff and the Florida Subclass are further entitled to reasonable attorneys' fees under Section 517.211(6).

**COUNT IX**
**Declaratory Judgment, 28 U.S.C. §§2201–2202**
**(On Behalf of Plaintiff and the Nationwide Class, Against Delaware Life)**

176. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

177. An actual, present, and justiciable controversy exists between Plaintiff and Class Members, on the one hand, and Delaware Life, on the other, concerning the parties' rights and obligations under the Annuities. Delaware Life has taken the position, in writing, that it has "no contractual basis to terminate the contract without surrender charges and penalties" and that it "must decline to cancel the contract without penalty," and it continues to administer every Class Member's Annuity on that basis. Class Members who remain in their contracts must decide, now, whether to pay Delaware Life's exit charges or remain exposed to an insurer that misreported the assets backing their guarantees, and they cannot make that decision without a determination of their rights.

178. Plaintiff and the Class are entitled to a declaration that: (a) the Annuities were procured by Delaware Life's concealment of material facts it was bound to disclose and are voidable at the election of the purchaser; (b) a Class Member who elects to rescind is entitled to the return of premium paid or applied without deduction of surrender charges, Market Value Adjustments, or other penalties; (c) surrender charges and Market Value Adjustments assessed against Class Members who surrendered on or after June 26, 2026 must be refunded; and (d) Delaware Life may not enforce the surrender-charge and Market Value Adjustment provisions of the Annuities to defeat rescission or the return of premium.

179. Plaintiff further seeks such further necessary or proper relief based on that declaration as this Court may grant under 28 U.S.C. §2202, including an injunction prohibiting Delaware Life from assessing surrender charges or Market Value Adjustments against Class Members who elect to rescind.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully prays for judgment against Defendants, jointly and severally, and requests the following relief:

A. An Order certifying the Class, the Florida Subclass, and the Post-Subpoena Purchaser Subclass as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A judgment declaring that Delaware Life breached the applicable annuity contracts and riders and that Defendants are liable to Plaintiff and the Class;

C. A judgment declaring that the undisclosed related-party concentration materially undermined or rendered misleading Defendants' representations concerning Delaware Life's financial strength and claims-paying ability, that the Annuities are voidable at the election of the

purchaser, and that surrender charges and Market Value Adjustments may not be enforced to defeat rescission or the return of premium;

D. An award of compensatory damages to Plaintiff and the Class, including rescission and return of the premiums paid or applied in each transaction, without surrender charges, Market Value Adjustment, or other penalty, and an award of all surrender charges and Market Value Adjustment charges already paid;

E. An award of rescission and return of premium without surrender charges or Market Value Adjustment, restitution and disgorgement, and restitution of such charges already paid, under Indiana common law and, on behalf of the Florida Subclass, Chapter 517, Florida Statutes;

F. An award of punitive damages in an amount sufficient to punish Defendants and deter similar conduct; an award of compensatory and punitive damages against the Non-Issuer Defendants, jointly and severally, on Plaintiff's aiding and abetting and civil conspiracy claims;

G. Pre- and post-judgment interest at the maximum rate permitted by law;

H. An award of attorneys' fees and costs of suit;

I. An Order enjoining Defendants from concealing or misrepresenting the related-party concentration of assets supporting annuity guarantees and from enforcing surrender charges or Market Value Adjustments to impede rescission or return of premium; and

J. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED: September 16, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON
Florida Bar No. 84824
MARK J. DEARMAN
Florida Bar No. 982407
FACUNDO M. SCIALPI
Florida Bar No. 1030791

*s/ Stuart A. Davidson*
Stuart A. Davidson

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
fscialpi@rgrdlaw.com

Attorneys for Plaintiff and the Class